## ATTACHMENT A

## **STATEMENT OF FACTS**

1.      The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section"), the United States Attorney's Office for the District of Maryland (the "Office"), and the defendant Transport Logistics International, Inc. ("TLI"). Certain of the facts herein are based on information obtained from third parties by the Fraud Section and the Office through their investigation and described to TLI. TLI hereby agrees and stipulates that the following facts and conclusions of law are true and accurate. TLI admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below.

### **Relevant Entities and Individuals**

2.      Defendant TLI was a United States company headquartered in Maryland, and thus a "domestic concern," as that term is used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-2(h)(1)(B). TLI was in the business of providing logistical support services for the transportation of nuclear materials to customers in the United States and to foreign customers.

3.      Daren Condrey ("Condrey"), who has been charged separately, was a citizen of the United States and resident of Maryland. Condrey was an owner and executive of TLI from in or about August 1998 through in or about October 2014. Condrey was also the co-President of TLI from in or about January 2010 through in or about October 2014. Thus, Condrey was a

A-1

domestic concern" and an officer, employee, and agent of a "domestic concern," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

4.       Mark Lambert ("Lambert") was a citizen of the United States and resident of Maryland.  Lambert was an owner and executive of TLI from in or about August 1998 through in or about September 2016.  Thus, Lambert was a "domestic concern" and an officer, employee, and agent of a "domestic concern," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

5.       "Co-Conspirator One," a person whose identity is known to the United States and TLI, was an owner and executive of TLI from in or about 1998 to in or about December 2009, and a consultant to TLI from in or about January 2010 through in or about 2011.

6.       JSC Techsnabexport ("TENEX") supplied uranium and uranium enrichment services to nuclear power companies throughout the world on behalf of the government of the Russian Federation.  TENEX was indirectly owned and controlled by, and performed functions of, the government of the Russian Federation, and thus was an "agency" and "instrumentality" of a foreign government, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2).

7.       TENAM Corporation ("TENAM"), located in the United States, was a wholly-owned subsidiary of TENEX established in or about October 2010.  TENAM was TENEX's official representative office in the United States.  TENAM was owned and controlled by, and performed functions of, the government of the Russian Federation, and thus was an "agency" and "instrumentality" of a foreign government, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2).

A-2

8.      Vadim Mikerin ("Mikerin"), who has been charged separately, was a national of the Russian Federation. Mikerin was a Director of TENEX from at least in or around 2004 through in or around 2011, and also was the President of TENAM from in or around October 2010 through in or around October 2014. From in or around 2011 through in or around October 2014, Mikerin was a resident of Maryland. Mikerin was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2).

9.      "Shell Company A," a company whose identity is known to the United States and TLI, was a shell company with a purported physical address in the Republic of Seychelles. Shell Company A had bank accounts at financial institutions in Cyprus associated with a Russian national.

10.      "Shell Company B," a company whose identity is known to the United States and TLI, was a shell company with a purported physical address in the United Kingdom. Shell Company B had a bank account at a financial institution in Latvia associated with a Russian national.

11.      "Shell Company C," a company whose identity is known to the United States and TLI, was a shell company with a purported physical address in the British Virgin Islands. Shell Company C had bank accounts at financial institutions in Switzerland associated with a Russian national.

### The Bribery Scheme

12.      Between at least 2004 and 2014, TENEX routinely contracted with TLI to transport uranium to and from the United States. During that time period, TLI, together with its co-conspirators, including Condrey, Lambert, and Co-Conspirator One, knowingly and willfully

A-3

conspired to corruptly pay approximately $1.7 million for the benefit of Mikerin to secure improper advantages and to influence Mikerin in order to obtain and retain business with TENEX. Through this illegal scheme, TLI obtained profits of approximately $11.6 million.

13. At the outset of the bribery scheme, Mikerin communicated directly with Co-Conspirator One, a TLI executive at the time, about the bribe payments. Mikerin directed the timing of when TLI was to make the bribe payments and the offshore bank accounts that were to receive the bribe payments.

14. At some point in or before 2009, Condrey and Lambert learned that Co-Conspirator One had agreed with Mikerin to make corrupt payments in order for TLI to obtain and retain business and contracts with TENEX. Co-Conspirator One explained that the amount of each corrupt payment was based on an agreement with Mikerin to kickback a percentage of certain contract awards that TENEX awarded to TLI, and that TLI would continue to win contract awards with TENEX if such corrupt payments were made.

15. Soon after learning of the corrupt scheme, Condrey and Lambert agreed to enter into the conspiracy to make corrupt payments to offshore bank accounts to benefit Mikerin in order to help TLI obtain and retain business with TENEX.

16. In order to conceal and further the scheme, Condrey, Lambert, Mikerin, and Co-Conspirator One used code words like "lucky figure," "LF," "lucky numbers," "cake," "remuneration" and "commission" when communicating about the corrupt bribe payments.

17. In order to justify the bribe payments TLI was making, the involved TLI executives caused fake invoices to be prepared, which purported to be from TENEX to TLI and fraudulently described services that were never provided by TENEX to TLI.

A-4

a.        For example, on or about November 30, 2009, Condrey sent an email to Co-Conspirator One, copying Lambert and a TLI employee who worked on accounting matters and processed outgoing payments. Condrey attached a spreadsheet entitled "2009 TENEX Commissions," and Condrey stated, "We need an invoice from TENEX (dated December) for $8,157.00 so we can update our financials and get commissions off the books this year."[1]

b.        A document purporting to be "TENEX Invoice No. 30827," dated December 1, 2009, was created. The document described services that were never provided to TLI to justify a corrupt payment of approximately $8,157.

c.        On or about December 3, 2009, TLI made a wire transfer payment of approximately $8,157 from TLI's bank account in Maryland to a Shell Company A bank account in Cyprus.

d.        On or about December 4, 2009, Co-Conspirator One e-mailed Mikerin and wrote: "Cake was delivered yesterday as planned."

18.      Co-Conspirator One left TLI in early 2010, but continued to work for TLI as a consultant. Upon Co-Conspirator One's departure from TLI, Condrey and Lambert became co-Presidents of TLI and they continued to conspire with Co-Conspirator One to communicate with Mikerin and facilitate the corrupt bribery scheme.

a.        For example, on or about February 8, 2010, Mikerin emailed Co-Conspirator One, stating: "Would you please confirm your ability to support TLI's Cake Cooking on a regular basis once per Q at 5% net volume for RuParty."

---

[1] Unless bracketed, all quotations identified herein appear as in the original document, without corrections or indications of misspellings or typographical errors.

b.      On or about February 8, 2010, Co-Conspirator One sent an email to Mikerin stating, in part, "I met with TLI principals last week and confirmed the cake process on a quarterly basis – all is well."

c.      On or about April 8, 2010, Co-Conspirator One emailed Condrey and stated, "Vadim [Mikerin] has confirmed the delivery address as the same as the last one." Co-Conspirator One also attached a scanned document purporting to be TENEX "Invoice No. 30946," which described services that were never provided to TLI to justify a corrupt payment of approximately $17,145.75. Four days later, TLI made a wire transfer payment of approximately $17,145.75 from TLI's bank account in Maryland to a Shell Company A bank account in Cyprus.

19.      Co-Conspirator One died in or around August 2011. After Co-Conspirator One's death, and continuing through in or around October 2014, Condrey and Lambert continued the corrupt bribery scheme and communicated directly with Mikerin to obtain fraudulent invoices and facilitate the corrupt bribery payments.

a.      For example, on or about September 23, 2011, Mikerin emailed Condrey and Lambert from Mikerin's personal email address to provide inside information from TENEX to assist TLI in obtaining a new contract award over "the other two competitors," in exchange for additional corrupt bribe payments. In the email, Mikerin requested, in relevant part, that Condrey and Lambert "initiate from your side new quotations for filled and empty cylinders transportation" for 2012 and 2013, which TLI should email to a senior official at TENEX, and Mikerin suggested that TLI offer firm quotations for empty cylinder transportation of "350-450 units in CY 2012 (Q3-Q4) @ $400/cyl (max !)," "outstanding quantity up to 120 units in

CY2013 (Q1) @ $450/cyl (max !)." Mikerin specified that the "rates should include new Lucky Figures."

b.      On or about December 2, 2011, Mikerin emailed Condrey and Lambert from his personal email address, with the subject line, "news and lucky figure," and stated, in relevant part, "with the understanding of the forthcoming end of Q4 and CY2011 please tell me what lucky figure will be when we should start our process (docs, etc.)."

c.      On or about December 20, 2011, as a follow-up to the "news and lucky figure" email referenced in Paragraph 19b above, Condrey replied to Mikerin at his personal email address, copying Lambert, "I am off from work today. . . . Just shoot me an email with your proposal, or you can call [Lambert] at the office as he is fully informed, and we can finalize how you want to proceed."

d.      Later that day, Mikerin emailed Condrey and Lambert from his personal email address in response to the email referenced in Paragraph 19c above, and asked them to advise "if you MIGHT or NEED to release funds til[] the end of the Year subject to our agreement in all subjects." Mikerin added that he was traveling to Moscow, Russia, and he asked whether Lambert had any information about a transportation-related demurrage fee that TLI was disputing with TENEX.

e.      Later that day, Lambert replied to Mikerin at his personal email address in response to the email referenced in Paragraph 19d above, and explained, "We'd plan on making the 4th quarter payment before the end of the year, once we can confirm the final amount." Lambert added that he and Condrey had not heard anything about the disputed demurrage fee from TENEX.

f.      On or about December 21, 2011, after Mikerin arrived in Moscow, Mikerin sent a reply email to Condrey and Lambert in response to the email referenced in Paragraph 19e above.  In his email, Mikerin attempted to resolve TLI's disputed demurrage fee with TENEX by reducing the "subject cost [$]6,750 from 'Lucky figures' being calculated for Q4 2011. . . . [and] based on this the Invoice will be arranged just today and sent to you.  [Y]our payment is to be effected on [December] 23 in order to be ahead of the holiday season and to allow [Shell Company B] to get the funds early next week.  [I]f our Big Friend improves the issue some time later and you are Ok with the results we will reestablish Lucky Figures for Q1 2012[.]  I've just got 'Ok' to proceed with [Shell Company B] in the shortest possible time (hot market activities) and kindly request you to confirm and give 'green light'."

g.      Later that day, Condrey sent an email to Mikerin at his personal email address in response to the email referenced in Paragraph 19f above, copying Lambert, to "confirm and give the 'Green Light,'" and to request the invoice.

h.      Later that day, Mikerin emailed Condrey from Moscow using his personal email address.  Mikerin attached a document to the email, which purported to be TENEX "Invoice No. 35685" and was dated December 12, 2011.  The document fraudulently described services that were never provided to TLI to justify a corrupt and fraudulent payment of approximately $125,930.53.  On the following day, TLI made a wire transfer payment of approximately $125,930.53 from TLI's bank account in Maryland to a Shell Company B bank account in Latvia.

i.      On or about March 28, 2012, Mikerin emailed Condrey and Lambert from his personal email account, and stated in relevant part, "Hello Daren [Condrey] and Mark

A-8

[Lambert], Thank you both for your visit [to] our 'noisy' location on Monday and energetic lunch together. . . . Also a channel for 'lucky figures' process has been checked and confirmed (no changes), so you will get an invoice for the amount [$]48,089.30 tomorrow.  Would you please to confirm that it'll be done before the end of the month of Q1 or early next week[?]"

j.        Later that day, Condrey sent an email to Mikerin at his personal email account in response to the email referenced in Paragraph 19i above, copying Lambert, and stated in relevant part, "We will check with accounting and get back to you on time frame for payment of invoice, when received."

k.        Later that day, Mikerin emailed Condrey from his personal email account and attached a document, which purported to be TENEX "Invoice No. 1547-12."  The document fraudulently described services that were never provided to TLI to justify a corrupt and fraudulent payment of approximately $48,089.30.  On the following day, TLI made a wire transfer payment of approximately $48,089.30 from TLI's bank account in Maryland to a Shell Company B bank account in Latvia.

l.        On or about May 22, 2012, Mikerin emailed Condrey from his personal email address, with the subject line reading "invoice LF," and stated, "The subject invoice enclosed."  Mikerin attached a document to the email, which purported to be TENEX "Invoice No. 2441-12," dated May 23, 2012, and which fraudulently described services that were never provided to TLI to justify a corrupt and fraudulent payment of approximately $121,962.33.  Three days later, TLI made a wire transfer payment of approximately $121,962.33 from TLI's bank account in Maryland to a Shell Company B bank account in Latvia.

m.      On or about April 2, 2013, Mikerin emailed Condrey from his personal email address, with the subject line "Figures," and stated, "Please advise when Q1 'LF' can be done to check on our side in advance."

n.      The following day, Condrey sent an email to Mikerin in response to the email referenced in Paragraph 19m above, and attached a draft of an internal TLI spreadsheet that documented TLI's contracts with TENEX and the corrupt bribe payments that TLI owed TENEX under the column "7% Remun."  Condrey stated, "See attached.  If we receive payment of 13-104 [a TLI invoice to TENEX] by April 26 (when due) then we may be able to arrange full amount by end of April."  Condrey explained that TLI could make a corrupt payment without the bribe amount associated with invoice 13-104 at that time, or they could wait until TENEX paid amount invoiced in invoice 13-104, at which point TLI would be in a position to make the full corrupt payment.

o.      On or about April 8, 2013, Mikerin sent an email to Condrey in response to the email referenced in Paragraph 19n above, and agreed to postpone the date when TLI's corrupt kickback payment should be made.

p.      On or about April 28, 2013, after TENEX remitted payment to TLI for TLI invoice 13-104, Mikerin emailed Condrey from his personal email address, stating, "Please find the due Invoice.  Please not[e] that the previous file was provided with the NEW INSTRUCTIONS where to go ([Shell Company C] instead of [Shell Company B]). . ."  Mikerin attached a document that purported to be TENEX "Invoice No. 1368-04," which was dated April 25, 2013 and fraudulently described services that were never provided to TLI to justify a corrupt and fraudulent payment of approximately $25,774.  On or about May 6, 2013, TLI made a wire

A-10

transfer payment of approximately $25,774 from TLI's bank account in Maryland to a Shell Company C bank account in Switzerland.

q. On or about June 26, 2013, Mikerin emailed Condrey and Lambert about "our LF Q2 matter," among other things.

r. Later that day, Lambert sent an email to Mikerin in response to the email referenced in Paragraph 19q above, and explained that Condrey was out of the office, but Lambert was "in the office today if you have any questions."

s. Later that day, Mikerin sent an email to Lambert in response to the email referenced in Paragraph 19r above, and stated, "I'll call you tmr to discuss details." On or about July 11, 2013, TLI made a wire transfer payment of approximately $95,833.55 from TLI's bank account in Maryland to a Shell Company B bank account in Latvia.

t. On or about August 26, 2013, Mikerin emailed Condrey from his personal email address with an attached document, stating in relevant part, "The subject invoice is attached." Mikerin attached a document that purported to be TENEX "Invoice No. 1491-08," which fraudulently described services that were never provided to TLI to justify a corrupt payment of approximately $94,102.00.

u. On or about August 28, 2013, Mikerin emailed Condrey from his personal email address to follow up on his email referenced in Paragraph 19t above, and attached a file with wiring instructions for Shell Company C, stating, "Daren [Condrey], please find enclosed the file with instructions for transfer to [Shell Company C] (the same as it was in May)."

v. Later that day, Mikerin emailed Lambert, in relevant part, ". . . please advise me (based on our short business meeting with Daren [Condrey] last Tue.) how quick we

A-11

can proceed with our "LF" matter, possible by the end of this week?  As agreed with Daren [Condrey] I sent an e-mail (with a doc enclosed) on Mon. [August 26, 2013] but didn't hear from him."  On or about August 30, 2013, TLI made a wire transfer payment of approximately $94,102 from TLI's bank account in Maryland to a Shell Company C bank account in Switzerland.

20.     On or about March 31, 2014, Condrey and Lambert learned that TENEX failed to award a certain contract to TLI, and Condrey forwarded to Lambert an email that Condrey had sent to Mikerin at his personal email address.  In the email to Mikerin, Condrey stated, "[w]e are advising our parent company today that we were informed by TENEX that we were not successful in our bid . . . . Everything we do now, in regards to bids for TENEX, will be reviewed and scrutinized.  And I do mean everything.  Later this week, [Lambert] and I will discuss what path we want to take in the future.  Considering that price is the only factor that matters at this point."

21.     On or about October 1, 2014, TLI made the final bribery payment, an approximately $45,954.45 wire transfer payment from TLI's bank account in Maryland to a Shell Company C bank account in Switzerland.

22.     During the conspiracy, TLI, together with its co-conspirators, including Condrey, Lambert, and Co-Conspirator One, knowingly and willfully conspired to corruptly make the following 36 bribe payments, totaling over $1.7 million, for the benefit of Mikerin, to secure improper advantages and to influence Mikerin in order to obtain and retain business with TENEX:

A-12

| Date | Recipient | Amount (USD) |
|---|---|---|
| March 16, 2005 | Offshore Account | $31,305.00 |
| January 30, 2006 | Offshore Account | $3,100.00 |
| June 30, 2006 | Offshore Account | $3,288.00 |
| December 15, 2006 | Offshore Account | $21,860.00 |
| April 18, 2007 | Shell Company A | $26,320.00 |
| October 1, 2007 | Shell Company A | $17,392.00 |
| April 21, 2008 | Shell Company A | $20,801.25 |
| September 9, 2008 | Shell Company A | $14,743.75 |
| April 15, 2009 | Shell Company A | $28,069.00 |
| May 22, 2009 | Shell Company A | $49,058.00 |
| July 29, 2009 | Shell Company A | $13,960.00 |
| October 30, 2009 | Shell Company A | $49,206.50 |
| December 3, 2009 | Shell Company A | $8,157.00 |
| April 12, 2010 | Shell Company A | $17,145.75 |
| June 23, 2010 | Shell Company A | $51,096.50 |
| September 9, 2010 | Shell Company A | $80,756.31 |
| November 4, 2010 | Shell Company A | $47,048.79 |
| December 15, 2010 | Shell Company A | $25,371.40 |
| February 15, 2011 | Shell Company A | $29,724.50 |
| April 11, 2011 | Shell Company A | $62,227.88 |
| July 7, 2011 | Shell Company B | $49,176.81 |
| September 27, 2011 | Shell Company B | $81,397.21 |
| December 22, 2011 | Shell Company B | $125,930.53 |
| March 29, 2012 | Shell Company B | $48,089.30 |
| May 25, 2012 | Shell Company B | $121,962.33 |
| August 30, 2012 | Shell Company B | $108,950.80 |
| December 18, 2012 | Shell Company B | $142,204.30 |
| May 6, 2013 | Shell Company C | $25,774.00 |

A-13

| July 11, 2013 | Shell Company B | $95,833.55 |
|---|---|---|
| August 30, 2013 | Shell Company C | $94,102.00 |
| October 30, 2013 | Shell Company C | $77,896.00 |
| November 8, 2013 | Shell Company C | $62,457.93 |
| December 16, 2013 | Shell Company C | $57,713.42 |
| March 28, 2014 | Shell Company C | $28,504.00 |
| May 30, 2014 | Shell Company C | $28,637.00 |
| October 1, 2014 | Shell Company C | $45,954.45 |

A-14