1              IN THE UNITED STATES
                DISTRICT COURT
2        FOR THE DISTRICT OF MARYLAND
                SOUTHERN DIVISION
3
   UNITED STATES OF AMERICA        )
4                                  )
             Plaintiff,            )
5                                  ) CRIMINAL CASE NO. TDC-18-0011
             vs.                   )
6                                  )
   TRANSPORT LOGISTICS             )
7  INTERNATIONAL, INC.,            )
                                   )
8            Defendant.            )

9        TRANSCRIPT OF PROCEEDINGS - MOTIONS HEARING
           BEFORE THE HONORABLE THEODORE D. CHUANG
10              UNITED STATES DISTRICT JUDGE
            MONDAY, MARCH 12, 2018; 2:00 P.M.
11                GREENBELT, MARYLAND

12                A P P E A R A N C E S

13 FOR THE PLAINTIFF:

14     OFFICE OF THE UNITED STATES ATTORNEY
             BY:  DAVID SALEM, MICHAEL PACKARD,
15                CHRISTOPHER CESTARO
             6406 IVY LANE, SUITE 800
16           GREENBELT, MARYLAND 20770
             (301) 344-4433
17
   FOR THE DEFENDANT:
18
       WINSTON & STRAWN LLP
19           BY:  THOMAS MATTHEW BUCHANAN
             1700 K STREET, NW
20           WASHINGTON, DC 20006
             (202) 282-5787
21
       ***Proceedings Recorded by Mechanical Stenography***
22           Produced By Computer-Aided Transcription

23  _____

        MARLENE MARTIN-KERR, RPR, RMR, CRR, FCRR
24          FEDERAL OFFICIAL COURT REPORTER
            6500 CHERRYWOOD LANE, STE 200
25            GREENBELT, MARYLAND 20770
                 (301)344-3499

P R O C E E D I N G S

1   (Call to Order of the Court.)

2   THE DEPUTY CLERK:  All rise.

3   The United States District Court for the District of

4   Maryland is now in session, the Honorable Theodore D. Chuang

5   presiding.

6   THE COURT:  Good morning -- good afternoon.  Please

7   be seated.

8   THE DEPUTY CLERK:  The matter now pending before this

9   Court is Criminal No. TDC-18-0011, United States of America

10  versus Transport Logistics International, Incorporated.  We're

11  here for the purpose of a status hearing.

12  Counsel, please identify yourself for the record.

13  MR. SALEM:  Good afternoon, your Honor.  David Salem

14  and Michael Packard on behalf of the United States.  With us at

15  counsel table is Chris Cestaro, who is the Assistant Chief of

16  the Fraud Section, Department of Justice.  And to Mr. Packard's

17  left is Derek Ettinger who also works as trial attorney for the

18  Fraud Section, Department of Justice.

19  THE COURT:  Good afternoon.

20  MR. SALEM:  We're here today, your Honor, for an

21  arraignment of the company, as well as the status conference,

22  and then to deal with deferred prosecution.

23  THE COURT:  Okay, I was not aware we were doing an

24  arraignment but that's fine.

1          MR. SALEM:  Your Honor, with the Court's permission,

2    I think Mr. Cestaro will speak for the Government during the

3    afternoon today.

4          THE COURT:  Okay.

5        And then for the Defense?

6          MR. BUCHANAN:  Thomas Buchanan from the firm Winston

7    & Strawn on behalf of TLI, and with me is the corporate

8    representative, the present CEO of TLI, Adrien Magnan.

9          THE COURT:  Okay, thank you.  Good afternoon.

10          MR. MAGNAN:  Good afternoon.

11          THE COURT:  So I suggested we get together today

12   because I think the Government provided me with their proposed

13   Deferred Prosecution Agreement, and I wanted to get a little

14   more context for how it came to this.  I had a few questions

15   about it.

16        First of all, just so I understand it, Mr. Cestaro,

17   we've -- you filed the Information; is that correct?

18          MR. Cestaro:  Yes, your Honor.  The Information was

19   filed on January 10th.

20          THE COURT:  And the idea here is that as part of your

21   overall investigation, some of the executives have already

22   either been prosecuted or are currently being prosecuted; is

23   that right?

24          MR. CESTARO:  That's correct, your Honor.

25          THE COURT:  So can you tell me a little bit about the

1   -- maybe you can pull the microphone up a little higher.  Tell

2   me what you know about this company now versus at the time this

3   was all happening.  So, for example, was current management

4   part of the management structure when this was all going on, or

5   is it sort of under new management?

6            MR. CESTARO:  Yes.  So at the time of the conduct

7   that's alleged in the Information, there were individuals at

8   the company that were involved in that conduct, and so we were

9   holding the company responsible for the actions of those

10  individuals.

11       At this present time, the company has fully remediated and

12  the culpable individuals are no longer at the company; and so

13  the company is employing individuals that were innocent of the

14  conduct that was alleged in the Information.

15            THE COURT:  So give me a better sense then.  So, for

16  example, the current Board of Directors.  The events of the

17  conspiracy runs through 2014.  So are there any members of the

18  Board of Directors now who were members of the Board of

19  Directors four years ago or any officers?

20            MR. CESTARO:  There are overlapping employees and

21  officers but it's not -- the individuals that are culpable of

22  the conduct, the individuals that were engaged and involved in

23  the conduct are no longer with the company.

24            THE COURT:  Just the two individuals that have been

25  charged, or are there other people who were also involved?

1          MR. CESTARO:  As far as the individuals that are

2     culpable, are the individuals that have been charged in this

3     matter.

4          THE COURT:  Well, I don't know what you mean by

5     individuals who are culpable.  I mean, no one is culpable until

6     they are convicted.  So you're telling me that you know who was

7     involved and who wasn't involved, and none of the people who

8     currently work at the company were involved in any criminal

9     activity?  That's your representation now?

10          MR. CESTARO:  That is what our investigation has

11     determined at this point, your Honor.

12          THE COURT:  Okay.

13        But there are overlapping directors and officers from that

14     time?

15          MR. CESTARO:  Yes, your Honor.

16          THE COURT:  But in terms of being able to say, for

17     example, that no one from the company was involved, that's one

18     thing; but you could also -- you wouldn't by able to say there

19     is no one -- I mean, one question I think that crossed my mind

20     was, was there anybody in the leadership position at the

21     company who should have uncovered this?

22        And there certainly were people who were in place, you

23     said, so perhaps there were people who at least had the

24     potential for having uncovered this and who didn't, whether

25     they have been charged or whether anyone has found any evidence

1   against them or not.

2          MR. CESTARO:  The individuals that have been charged

3   are -- were the highest level executives at the company.  So it

4   was the co-presidents of the company.  So they -- there were

5   not people above them other than the Board of Directors.

6          THE COURT:  So who was the Board of Directors in the

7   sense of -- I don't think I have the context for how large a

8   company this is.  You know, are the directors independent?  Are

9   the directors inside directors?  Sometimes it's a family

10  business.  Give me more context on what the directors were like

11  at the time of the incident.

12         MR. CESTARO:  So this was a small company that is

13  owned by an overseas parent company, and the directors

14  included --

15         THE COURT:  Where is the overseas parent company

16  located?

17         MR. CESTARO:  There is a company located in Germany

18  and a company -- an ultimate parent located in France.

19         THE COURT:  Okay.

20         MR. CESTARO:  And so the Board of Directors included

21  the co-presidents of the company, as well as representatives

22  from -- that were appointed from the parent company.

23      At this point the two co-presidents that were involved in

24  this conduct are no longer with the company, are no longer on

25  the Board of Directors, and the company continues.  We have not

1   identified evidence that individuals at the parent companies

2   were involved and complicit in the misconduct.

3        And so we have identified that the appropriate resolution

4   in this case is with TLI, and we've also determined that the

5   appropriate resolution in this matter is a deferred prosecution

6   with the company; and so we're before the Court today seeking

7   to defer prosecution pursuant to the terms of the Agreement.

8            THE COURT:  I understand.  So just let me finish up

9   my line of questions on that issue.

10       So the Board of Directors pre-dating the -- or during the

11  time of this incident, we have the co-presidents who were

12  inside directors.  The other directors were all outside.  They

13  weren't part of company management; they were just --

14           MR. CESTARO:  As far as other directors, I believe

15  they were all outside of TLI, the organization itself, yes.

16           THE COURT:  Okay.

17       And then are any -- were there any officers of the company

18  who are still officers of the company?

19           MR. CESTARO:  Officers of the company at the time

20  that are still officers of the company today?

21           THE COURT:  Yes.

22           MR. CESTARO:  I believe the Chief Financial Officer

23  at the time is still an officer of the company today.

24           THE COURT:  In the same position?

25           MR. CESTARO:  I believe so, your Honor, yes.

1          THE COURT:  And what about the current CEO?  What was

2    the CEO's status in 2014?

3          MR. CESTARO:  I believe the CEO was brought in after

4    this misconduct occurred.

5          THE COURT:  Okay.

6       And you said the CFO then is the only holdover officer

7    from the 2014 time period?

8          MR. CESTARO:  I believe that is correct.  If Counsel

9    will correct me if I'm wrong in that.

10         MR. BUCHANAN:  That is correct.

11         THE COURT:  Okay.

12      So it's all new management except for the CFO?

13         MR. CESTARO:  Yes, your Honor.

14         THE COURT:  And all new directors except for the two

15   charged individuals?

16         MR. CESTARO:  The independent directors from the

17   parent company may still be --

18         THE COURT:  I see.

19         MR. CESTARO:  -- with the parent company.

20         THE COURT:  Okay.

21      Okay, and then I did want to ask about this independent

22   analysis that supposedly occurred regarding the ability of the

23   company to pay a fine.  So I think it said that not just the

24   company but the Government had identified someone independent

25   to conduct an analysis.  Could you tell me more about how that

1  came about, what it consisted of?

2  MR. CESTARO:  Yes, your Honor.

3  The company made a representation that it was unable to

4  pay the full guideline fine and we, the Department, went to

5  endeavor to test those assertions.  So we hired a forensic

6  accounting firm to assist us in that verification, and with the

7  assistance of the independent accounting firm, we did an

8  independent analysis of those assertions.

9  We determined that the company's assertions were accurate

10  and that the company was unable to pay more than the amounts

11  that are outlined in this agreement, and that paying more than

12  that amount would substantially jeopardize the company's

13  ability to continue.

14  And the sentencing guidelines themselves under 8C3.3(b)

15  make an allowance for this type of analysis to occur and state

16  that if the company has an inability to pay the full criminal

17  penalty, then it is appropriate then to determine the amount

18  that the company is able to pay without substantially

19  jeopardizing the continued existence of the company.

20  THE COURT:  So how many employees are there or what's

21  their annual -- I would like to get some order of magnitude for

22  how large this company is.  You know, what are their annual

23  sales, profits, number of employees?

24  MR. CESTARO:  The number of employees is in excess of

25  50 is my understanding.  I don't have the exact number

1  available to me.

2          THE COURT:  But below a hundred or something?

3     Mr. Buchanan?

4          MR. BUCHANAN:  It currently has 42 employees.

5          THE COURT:  42 employees, okay.  So not a

6  substantially large company.

7      And then what is their current line of business?  I don't

8  know if it's changed.

9          MR. BUCHANAN:  The current line of business, it's a

10 transportation company, and what it was involved in was

11 transporting -- at the time of the relevant time period, they

12 were involved in shipping and trucking enriched nuclear uranium

13 from Russia to the United States to nuclear power plants and

14 shipping it back.  And they also did other shipping.  They

15 manufactured cylinders to contain the enriched nuclear uranium.

16     So that's what they continue to be, a shipping company, a

17 transportation company.

18          THE COURT:  Primarily for uranium or for any -- for a

19 wide variety of products?

20          MR. BUCHANAN:  A hundred percent uranium.

21          THE COURT:  And how much of their business is

22 government contracts versus private business contracts?

23          MR. BUCHANAN:  I don't believe they have any

24 government contracts.

25          THE COURT:  Okay.  Or subcontracts?

1          MR. BUCHANAN:  They don't have any of those either.

2          THE COURT:  Okay.

3          MR. BUCHANAN:  A lot of the work they did that's

4    mentioned in the criminal information are related to a

5    government program where we worked for the government to

6    transport this enriched uranium from Russia to the United

7    States.  So that was pursuant to a program that we were paid by

8    the companies in question that we did work with.

9          THE COURT:  So, Mr. Cestaro, I know the senior

10   leadership of the company was involved in the alleged criminal

11   activity.  What percentage of the company's business in 2014

12   was, for lack of a better word, tainted by all of this

13   activity?  So, for example, the projects that were supported by

14   or that were obtained through these payments, is that 10

15   percent of the company's business at the time?  Was it

16   80 percent?  What would it have been?

17         MR. CESTARO:  My understanding is that it was a

18   substantial percentage of the company's business.  I don't know

19   the precise percentage.  It wasn't 80 percent.  It was a

20   smaller number than that, but I don't know the precise

21   percentage.

22         MR. BUCHANAN:  So currently it's zero but prior to

23   2014, I think it was about 70 percent that was involved with

24   TENEX, which is a company identified in the Information.

25         THE COURT:  Okay.

1          And then with respect to the activities of the -- you

2     mentioned this TLI was owned by a foreign company.  So the two

3     perpetrators or the two charged individuals, did they have an

4     ownership interest in the company?  Did they own any percentage

5     of the stock?  Was it negligible?  Was it a controlling

6     interest?  What was it at the time?

7               MR. CESTARO:  At the time the individuals had an

8     ownership interest in TLI itself.  I believe it was

9     approximately five percent each.

10              THE COURT:  Okay.

11         And then another question I have is I believe in your

12    submission you note that they did not -- the company did not

13    self-report any of this, correct?

14              MR. CESTARO:  That's correct, your Honor.

15              THE COURT:  So, as Mr. Salem has indicated, I don't

16    think it's that common to have deferred prosecution agreements

17    in this district, so I haven't dealt with them in this role,

18    though I've dealt with them in previous roles as an attorney;

19    and it seems as if, among other reasons, why you might give a

20    deferred prosecution agreement would be because the company

21    fully cooperated, the company uncovered the fraud, perhaps

22    maybe even have reported it, self-reported it to the

23    government.

24         My impression from the other cases that have -- that are

25    related in this case is that none of that happened.  There is

1  nobody from TLI, the Board -- no one came forward and said

2  we've got a problem here, government.  Am I missing something

3  or is that correct?

4          MR. CESTARO:  So while you're correct that the

5  company did not self-report the conduct, when the conduct was

6  brought to the company's attention, the company did fully

7  cooperate with our investigation and that cooperation assisted

8  in the prosecutions.

9          THE COURT:  Okay.

10          MR. CESTARO:  The company is continuing to cooperate

11  with our investigation.  The company also remediated the

12  conduct and removed the individuals that were involved.  The

13  company enhanced its compliance program.

14      And then another reason that a DPA was considered in this

15  matter is because there were collateral consequences that the

16  company may face with a guilty plea that are not as acute with

17  a deferred prosecution agreement.

18          THE COURT:  Such as?

19          MR. CESTARO:  Such as issues with their regulators,

20  as well as licensing issues that the company raised to our

21  attention that the company -- those collateral consequences are

22  less clear in the context of a deferred prosecution agreement;

23  and so in order to not put the company at a substantial

24  jeopardy of not continuing as a business, it was determined

25  that a DPA was appropriate in this situation.

1          THE COURT:  Okay.

2          MR. CESTARO:  And the only other thing I would note

3   is that we have -- the Department has entered into deferred

4   prosecution agreements with companies that did also not

5   self-report conduct.  This is not unique.

6          THE COURT:  So of the 49 employees, how many of them

7   are based in the United States, and how many of them are based

8   overseas?  Or 42, however the number was.

9          MR. CESTARO:  I believe the vast majority of those

10  are U.S. based employees.  All of them at this point?

11         MR. BUCHANAN:  They are all employed in the United

12  States.

13         THE COURT:  Where is the office of the headquarters

14  or the plant, whatever facility it is?

15         MR. BUCHANAN:  The plant is -- TLI headquarters is

16  not too far from here.  Fulton, Maryland.

17         THE COURT:  Where?

18         MR. BUCHANAN:  Fulton, Maryland.

19         THE COURT:  Okay.

20         MR. BUCHANAN:  It's a very small operation.

21     I would just point out that all of the employees came

22  forward and were interviewed by the Government, and the

23  Government determined, after interviewing all of the employees

24  that were in any way involved or referenced in any email, that

25  they were not involved and their jobs were dependent.

1       I would add that in terms of the issue of the regulation,

2   the regulators and permits and licenses were depended to

3   operate on these licenses and permits from the Department of

4   Transportation, Department of Commerce, NRC.  And the

5   Government and TLI have approached the regulators in sort of a

6   hypothetical presentation to what would happen if it were a DPA

7   versus a criminal plea, and obviously the stakes increased

8   dramatically if it's a criminal plea.

9       And so we're here basically to -- in this context to try

10  to save the jobs of those employees, which most likely will be

11  lost.

12          THE COURT:  Well, I don't know about that.  I mean,

13  how do we know the business couldn't be sold to someone else

14  totally independent of this activity?  I mean, you're

15  acknowledging the directors are some of the same people who

16  were running this company four years ago.  So how do we know

17  that these jobs would be lost if the company had to liquidate

18  and someone else could take over this line of work or sell it

19  to people who are completely untainted by this when you've got

20  a Board of Directors who were asleep at the switch?

21          MR. BUCHANAN:  Well, the Board of Directors, there

22  were two directors who were in the United States, one who has

23  pled and one who has been charged.  The other independent

24  director was in Germany.

25          THE COURT:  I thought -- you gave me the impression

1    that there was more than one other person.  Is that not right?

2    I thought you said that there were other directors.  You're

3    saying there were only three directors at the time?

4             MR. BUCHANAN:  There was also a French director, but

5    in terms of the United States --

6             THE COURT:  Who is still a director?

7             MR. BUCHANAN:  I think only the German director is

8    carried over.

9             THE COURT:  So there are four directors?  There were

10   at the time?

11            MR. BUCHANAN:  Right.

12            THE COURT:  So why weren't those directors removed as

13   part of this agreement?

14            MR. CESTARO:  Your Honor, we did not find evidence

15   that they were involved or complicit in this activity.

16            THE COURT:  They didn't have sufficient controls in

17   place, though, did they?

18            MR. CESTARO:  The company has since enhanced its

19   controls, and the company has taken, you know, the remedial

20   actions and the compliance enhancements necessary in order to

21   ensure that this does not continue to happen.

22            THE COURT:  So, Mr. Cestaro, just as a philosophical

23   matter from the Department of Justice standpoint, the thing

24   that always bothers me about deferred prosecution agreements is

25   that it seems as if the discussion is always about what do we

1  do to save the company when it's the company and its personnel

2  who were engaged in crimes.  I mean, why is the goal always to

3  save the company as opposed to render justice when there has

4  been significant criminal activity?

5          MR. CESTARO:  Well, here in this case --

6          THE COURT:  It seems like the Department spends a lot

7  of time trying to figure out how to save these companies when,

8  perhaps, they should not have engaged in crimes in the first

9  place.

10          MR. CESTARO:  Well, here, in this case, you know, we

11  are seeking justice, and we're holding the individuals that are

12  directly involved in this conduct accountable.  We have the

13  guilty plea.  We have the charges against the other

14  co-president.  We have the plea from Mr. Mikerin and the --

15  here the interest in protecting the company is really an

16  interest in protecting the innocent employees, the employees

17  that are currently working at the company that rely on the

18  company for a salary and not jeopardizing their continued --

19          THE COURT:  But the people who own the company, these

20  French and German interests, why are they being protected?

21  Because they are the ones who make the -- you know, get the

22  most out of this, not the employees.  Why aren't they forced to

23  get out of this business somehow?

24          MR. CESTARO:  We don't have a -- we don't have

25  evidence that those people were involved or aware of this

1  conduct and so --

2        THE COURT:  Well, the issue isn't really that, is it?

3  I mean, isn't the issue whether the company can be -- you filed

4  this Information.  So you believe there is probable cause to

5  believe that the institution is criminally liable, correct?

6        MR. CESTARO:  We believe -- yes, through the acts of

7  the employees that have been charged.

8        THE COURT:  So you have a case.  You have probable

9  cause to believe a crime was committed.  You have a potential

10  defendant, and yet you're deferring from prosecuting because

11  there are certain people as part of the company who had nothing

12  to do with it and because there is some collateral damage.

13      Every criminal case we have there is collateral damage.

14  There are family members who suffer greatly, and the Department

15  doesn't seem to worry about their fate when they charge a

16  defendant.  So why is this different?

17        MR. CESTARO:  Well, in this case, you know, the

18  company also, once the conduct was brought to their attention,

19  did the right things.  So the company fully cooperated.  The

20  company remediated.  Their cooperation was extensive and

21  assisted us in making these prosecutions, and the Department

22  wants to incent companies to continue to do those things, and

23  we think those things are extremely important.

24      So in addition to wanting the company -- we're not in the

25  business of trying to put companies out of business.  There is

1   also the cooperation and the remediation and the compliance

2   enhancements that we do want to incent going forward.

3          THE COURT:  Uh-huh.

4          MR. CESTARO:  And if this was simply an effort to try

5   to seek a death penalty for the company, then that may not

6   incent future companies to do those things, to cooperate, to

7   remediate, to --

8          THE COURT:  Or it would incentivize them to police

9   their own shops better than this one did.

10         MR. CESTARO:  Well, we're hopeful that through both,

11  you know, the Deferred Prosecution Agreement with the company

12  but also through the charges against the individuals and the

13  pleas with the individuals, that that will be a sufficient

14  deterrent to other companies and other individuals when viewing

15  conduct like this.

16         THE COURT:  How does a deferred prosecution agreement

17  provide any deterrence?

18         MR. CESTARO:  It has obligations for the company that

19  it needs to continue to cooperate, that the company needs to

20  report to the Government on an annual basis, that the company

21  needs to meet the standards of the compliance that's outlined

22  in the Agreement, as well as that the company needs to pay the

23  fine.

24      And so there are a number of obligations of the company,

25  and if the company doesn't meet those things, doesn't move

1   forward as a good corporate citizen, then the company will --

2   the Agreement will be breached, and the company will be

3   charged.  We think that is a significant deterrence.

4            THE COURT:  What about general deterrence, though?

5            MR. CESTARO:  General deterrence?  You know, I expect

6   companies are not looking to be -- enter into deferred

7   prosecution agreements.  Companies do not want to have -- you

8   know, be broadcast that they have engaged in misconduct, do not

9   want to pay criminal penalties, do not want to have the -- have

10  to report to the Government about their compliance, and do all

11  of these steps that are required in the agreement.

12       So that, coupled with the individual prosecutions, which

13  are closely aligned here, I think is a sufficient deterrent to

14  other individuals -- companies act through their individuals --

15  and other companies from engaging in this conduct going

16  forward.

17           THE COURT:  Okay.

18       Now, I think there had been some earlier informal

19  communication about whether we were going to seal any of these

20  proceedings.  Is it your position that either the proceedings

21  or the Deferred Prosecution Agreement or the Information or any

22  of this stuff needs to be sealed?

23           MR. CESTARO:  No, your Honor.  We would ask that the

24  Information be unsealed at this time.  We are prepared to file

25  the Deferred Prosecution Agreement at this time.  And so there

1   is no request for sealing.

2        THE COURT:  Okay.

3      So just as a matter of process, other than me

4   understanding the nature of this agreement, which I think I

5   have a better understanding of now, I appreciate both sides

6   providing me the information that you've provided, what other

7   steps are there from the Court's perspective that need to be

8   taken?

9        MR. CESTARO:  So, as your Honor is aware, there is no

10   requirement that the Court accept or review the terms of the

11   Agreement itself, but in this case, since there has been a

12   hearing in this matter now, this hearing, there is a

13   requirement that the Court find that time should be excluded

14   under the speedy trial in the interest of justice.

15      And so we --

16        THE COURT:  From when to when?

17        MR. CESTARO:  During the pendency of the Deferred

18   Prosecution Agreement.  And so the parties -- starting today.

19        THE COURT:  Yeah, I mean, I know you just submitted

20   some cases about an hour ago.  I was in a meeting and that's

21   why I was late.  So I actually haven't looked at these cases at

22   all yet.  I just understand you submitted them, but maybe you

23   can talk me through it now.

24        MR. CESTARO:  So the Court's role, once there has

25   been a hearing in a deferred prosecution agreement, is to make

1    a finding whether or not it's appropriate to exclude time under

2    the Speedy Trial Act.  And here, we, the parties, are jointly

3    moving orally, now at this hearing, that the Court make that

4    finding in the interest of justice.

5          But we will also follow up with written papers, a motion

6    and proposed order requesting that the Court do so; and that is

7    the primary role of the Court in a proceeding related to a

8    deferred prosecution agreement.  There is no requirement that

9    the Court accept the terms of the Agreement or adjudicate the

10   terms of the Agreement.

11         Should disputes arise during the Agreement and motions be

12   filed with the Court, then obviously the Court would be

13   requested to adjudicate and rule on those, but that is not

14   something that is anticipated or expected at this point.

15              THE COURT:  So the way you would propose the Speedy

16   Trial Act order or the way it would be handled would be to

17   cover -- would it be the length of the Agreement or would it be

18   the length of the Agreement plus any additional time?  It looks

19   like -- I mean, it's a different timing issue than what you

20   have in the Agreement regarding the statute of limitations.

21   All you need to do, I assume, is just toll the clock up until

22   the end of the Agreement.

23         And your assumption is if nothing happens, then, you know,

24   the matter will be closed; but if something were to happen, you

25   would still have your full 70 days from wherever you decide you

1  want to move forward?

2          MR. CESTARO:  Correct, your Honor.

3          THE COURT:  Okay.

4          MR. CESTARO:  Yes.

5          THE COURT:  Okay.

6      Mr. Buchanan, is there anything you want to add or

7  clarify?

8          MR. BUCHANAN:  No, your Honor.  We agree with the

9  Government's request.

10          THE COURT:  Okay.

11      Well, provisionally, I think I would agree that the time

12  between now and the end of the Deferred Prosecution Agreement

13  should be excluded from the speedy trial clock based on the

14  nature of this Agreement.  I will take a look at the cases you

15  submitted, and it sounds as if you are planning to submit the

16  written motion.  So I'll make that the formal ruling on the

17  issue once I've had a chance to look at these cases.

18      But I see no reason why I wouldn't -- at this point I

19  don't see any reason why I wouldn't agree with that.

20      Is there anything else we need to discuss today?

21          MR. BUCHANAN:  No, your Honor.

22          THE COURT:  Okay.  Well, thank you very much.  Have a

23  good afternoon.

24          MR. CESTARO:  Thank you, your Honor.

25          MR. BUCHANAN:  Thank you, your Honor.

1          THE DEPUTY CLERK:  All rise.

2      This Honorable Court now stands adjourned.

3      (The proceedings were adjourned at 2:38 P.M.)

4

5      I, Marlene Martin-Kerr, FCRR, RPR, CRR, RMR, certify that

6   the foregoing is a correct transcript of the stenographic

7   record of proceedings in the above-entitled matter.

8

9                    Dated this 21st day of March, 2018.

10

11                    _____/s/_____
                         Marlene Martin-Kerr
12                   Federal Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

## 1

**10** [1] - 11:14
**10th** [1] - 3:19

## 2

**2014** [5] - 4:17, 8:2, 8:7, 11:11, 11:23

## 4

**42** [3] - 10:4, 10:5, 14:8
**49** [1] - 14:6

## 5

**50** [1] - 9:25

## 7

**70** [2] - 11:23, 22:25

## 8

**80** [2] - 11:16, 11:19
**8C3.3(b** [1] - 9:14

## A

**ability** [2] - 8:22, 9:13
**able** [3] - 5:16, 5:18, 9:18
**accept** [2] - 21:10, 22:9
**accountable** [1] - 17:12
**accounting** [2] - 9:6, 9:7
**accurate** [1] - 9:9
**acknowledging** [1] - 15:15
**act** [1] - 20:14
**Act** [2] - 22:2, 22:16
**actions** [2] - 4:9, 16:20
**activities** [1] - 12:1
**activity** [6] - 5:9, 11:11, 11:13, 15:14, 16:15, 17:4
**acts** [1] - 18:6
**acute** [1] - 13:16
**add** [2] - 15:1, 23:6
**addition** [1] - 18:24
**additional** [1] - 22:18
**adjudicate** [2] - 22:9, 22:13
**Adrien** [1] - 3:8

**afternoon** [4] - 3:3, 3:9, 3:10, 23:23
**ago** [3] - 4:19, 15:16, 21:20
**agree** [2] - 23:8, 23:11, 23:19
**Agreement** [18] - 3:13, 7:7, 19:11, 19:22, 20:2, 20:21, 20:25, 21:11, 21:18, 22:9, 22:10, 22:11, 22:17, 22:18, 22:20, 22:22, 23:12, 23:14
**agreement** [10] - 9:11, 12:20, 13:17, 13:22, 16:13, 19:16, 20:11, 21:4, 21:25, 22:8
**agreements** [4] - 12:16, 14:4, 16:24, 20:7
**aligned** [1] - 20:13
**alleged** [3] - 4:7, 4:14, 11:10
**allowance** [1] - 9:15
**amount** [2] - 9:12, 9:17
**amounts** [1] - 9:10
**analysis** [4] - 8:22, 8:25, 9:8, 9:15
**annual** [3] - 9:21, 9:22, 19:20
**anticipated** [1] - 22:14
**appointed** [1] - 6:22
**appreciate** [1] - 21:5
**approached** [1] - 15:5
**appropriate** [5] - 7:3, 7:5, 9:17, 13:25, 22:1
**arise** [1] - 22:11
**asleep** [1] - 15:20
**assertions** [3] - 9:5, 9:8, 9:9
**assist** [1] - 9:6
**assistance** [1] - 9:7
**assisted** [2] - 13:7, 18:21
**assume** [1] - 22:21
**assumption** [1] - 22:23
**attention** [3] - 13:6, 13:21, 18:18
**attorney** [1] - 12:18
**available** [1] - 10:1
**aware** [2] - 17:25, 21:9

## B

**based** [4] - 14:7, 14:10, 23:13
**basis** [1] - 19:20

**behalf** [1] - 3:7
**below** [1] - 10:2
**better** [4] - 4:15, 11:12, 19:9, 21:5
**between** [1] - 23:12
**bit** [1] - 3:25
**Board** [11] - 4:16, 4:18, 6:5, 6:6, 6:20, 6:25, 7:10, 13:1, 15:20, 15:21
**bothers** [1] - 16:24
**breached** [1] - 20:2
**broadcast** [1] - 20:8
**brought** [3] - 8:3, 13:6, 18:18
**BUCHANAN** [20] - 3:6, 8:10, 10:4, 10:9, 10:20, 10:23, 11:1, 11:3, 11:22, 14:11, 14:15, 14:18, 14:20, 15:21, 16:4, 16:7, 16:11, 23:8, 23:21, 23:25
**Buchanan** [3] - 3:6, 10:3, 23:6
**business** [13] - 6:10, 10:7, 10:9, 10:21, 10:22, 11:11, 11:15, 11:18, 13:24, 15:13, 17:23, 18:25

## C

**carried** [1] - 16:8
**case** [8] - 7:4, 12:25, 17:5, 17:10, 18:8, 18:13, 18:17, 21:11
**cases** [5] - 12:24, 21:20, 21:21, 23:14, 23:17
**CEO** [3] - 3:8, 8:1, 8:3
**CEO's** [1] - 8:2
**certain** [1] - 18:11
**certainly** [1] - 5:22
**Cestaro** [5] - 3:2, 3:16, 3:18, 11:9, 16:22
**CESTARO** [47] - 3:24, 4:6, 4:20, 5:1, 5:10, 5:15, 6:2, 6:12, 6:17, 6:20, 7:14, 7:19, 7:22, 7:25, 8:3, 8:8, 8:13, 8:16, 8:19, 9:2, 9:24, 11:17, 12:7, 12:14, 13:4, 13:10, 13:19, 14:2, 14:9, 16:14, 16:18, 17:5, 17:10, 17:24, 18:6, 18:17, 19:4, 19:10, 19:18, 20:5, 20:23, 21:9, 21:17, 21:24,

**23:2, 23:4, 23:24
**CFO** [2] - 8:6, 8:12
**chance** [1] - 23:17
**changed** [1] - 10:8
**charge** [1] - 18:15
**charged** [9] - 4:25, 5:2, 5:25, 6:2, 8:15, 12:3, 15:23, 18:7, 20:3
**charges** [2] - 17:13, 19:12
**Chief** [1] - 7:22
**citizen** [1] - 20:19
**clarify** [1] - 23:7
**clear** [1] - 13:22
**clock** [2] - 22:21, 23:13
**closed** [1] - 22:24
**closely** [1] - 20:13
**co** [5] - 6:4, 6:21, 6:23, 7:11, 17:14
**co-president** [1] - 17:14
**co-presidents** [4] - 6:4, 6:21, 6:23, 7:11
**collateral** [4] - 13:15, 13:21, 18:12, 18:13
**Commerce** [1] - 15:4
**committed** [1] - 18:9
**common** [1] - 12:16
**communication** [1] - 20:19
**companies** [12] - 7:1, 11:8, 14:4, 17:7, 18:22, 18:25, 19:6, 19:14, 20:6, 20:7, 20:14, 20:15
**company** [86] - 4:2, 4:8, 4:9, 4:11, 4:12, 4:13, 4:23, 5:8, 5:17, 5:21, 6:3, 6:4, 6:8, 6:12, 6:13, 6:15, 6:17, 6:18, 6:21, 6:22, 6:24, 6:25, 7:6, 7:13, 7:17, 7:18, 7:19, 7:20, 7:23, 8:17, 8:19, 8:23, 8:24, 9:3, 9:10, 9:16, 9:18, 9:19, 9:22, 10:6, 10:10, 10:16, 10:17, 11:10, 11:24, 12:2, 12:4, 12:12, 12:20, 12:21, 13:5, 13:6, 13:10, 13:11, 13:13, 13:16, 13:20, 13:21, 13:23, 15:16, 15:17, 16:18, 16:19, 17:1, 17:3, 17:15, 17:17, 17:18, 17:19, 18:3, 18:11, 18:18,

**18:19, 18:20, 18:24, 19:5, 19:11, 19:18, 19:19, 19:20, 19:22, 19:24, 19:25, 20:1, 20:2
**company's** [6] - 9:9, 9:12, 11:11, 11:15, 11:18, 13:6
**completely** [1] - 15:19
**compliance** [5] - 13:13, 16:20, 19:1, 19:21, 20:10
**complicit** [2] - 7:2, 16:15
**conduct** [16] - 4:6, 4:8, 4:14, 4:22, 4:23, 6:24, 8:25, 13:5, 13:12, 14:5, 17:12, 18:1, 18:18, 19:15, 20:15
**consequences** [2] - 13:15, 13:21
**considered** [1] - 13:14
**consisted** [1] - 9:1
**conspiracy** [1] - 4:17
**contain** [1] - 10:15
**context** [5] - 3:14, 6:7, 6:10, 13:22, 15:9
**continue** [5] - 9:13, 10:16, 16:21, 18:22, 19:19
**continued** [2] - 9:19, 17:18
**continues** [1] - 6:25
**continuing** [2] - 13:10, 13:24
**contracts** [3] - 10:22, 10:24
**controlling** [1] - 12:5
**controls** [2] - 16:16, 16:19
**convicted** [1] - 5:6
**cooperate** [3] - 13:7, 13:10, 19:6, 19:19
**cooperated** [2] - 12:21, 18:19
**cooperation** [3] - 13:7, 18:20, 19:1
**corporate** [2] - 3:7, 20:1
**correct** [11] - 3:17, 3:24, 8:8, 8:9, 8:10, 12:13, 12:14, 13:3, 13:4, 18:5, 23:2
**Counsel** [1] - 8:8
**coupled** [1] - 20:12
**COURT** [65] - 3:4, 3:9, 3:11, 3:20, 3:25, 4:15, 4:24, 5:4, 5:12, 5:16, 6:6, 6:15, 6:19,

7:8, 7:16, 7:21, 7:24, 8:1, 8:5, 8:11, 8:14, 8:18, 8:20, 9:20, 10:2, 10:5, 10:18, 10:21, 10:25, 11:2, 11:9, 11:25, 12:10, 12:15, 13:9, 13:18, 14:1, 14:6, 14:13, 14:17, 14:19, 15:12, 15:25, 16:6, 16:9, 16:12, 16:16, 16:22, 17:6, 17:19, 18:2, 18:8, 19:3, 19:8, 19:16, 20:4, 20:17, 21:2, 21:16, 21:19, 22:15, 23:3, 23:5, 23:10, 23:22

**Court** [9] - 7:6, 21:10, 21:13, 22:3, 22:6, 22:7, 22:9, 22:12

**Court's** [3] - 3:1, 21:7, 21:24

**cover** [1] - 22:17

**crime** [1] - 18:9

**crimes** [2] - 17:2, 17:8

**criminal** [9] - 5:8, 9:16, 11:4, 11:10, 15:7, 15:8, 17:4, 18:13, 20:9

**criminally** [1] - 18:5

**crossed** [1] - 5:19

**culpable** [5] - 4:12, 4:21, 5:2, 5:5

**current** [5] - 4:3, 4:16, 8:1, 10:7, 10:9

**cylinders** [1] - 10:15

## D

**damage** [2] - 18:12, 18:13

**dating** [1] - 7:10

**days** [1] - 22:25

**dealt** [2] - 12:17, 12:18

**death** [1] - 19:5

**decide** [1] - 22:25

**defendant** [2] - 18:10, 18:16

**Defense** [1] - 3:5

**defer** [1] - 7:7

**Deferred** [6] - 3:13, 19:11, 20:21, 20:25, 21:17, 23:12

**deferred** [11] - 7:5, 12:16, 12:20, 13:17, 13:22, 14:3, 16:24, 19:16, 20:6, 21:25, 22:8

**deferring** [1] - 18:10

**Department** [8] - 9:4,

14:3, 15:3, 15:4, 16:23, 17:6, 18:14, 18:21

**depended** [1] - 15:2

**dependent** [1] - 14:25

**determine** [1] - 9:17

**determined** [5] - 5:11, 7:4, 9:9, 13:24, 14:23

**deterrence** [4] - 19:17, 20:3, 20:4, 20:5

**deterrent** [2] - 19:14, 20:13

**different** [2] - 18:16, 22:19

**directly** [1] - 17:12

**director** [4] - 15:24, 16:4, 16:6, 16:7

**Directors** [10] - 4:16, 4:18, 4:19, 6:5, 6:6, 6:20, 6:25, 7:10, 15:20, 15:21

**directors** [17] - 5:13, 6:8, 6:9, 6:10, 6:13, 7:12, 7:14, 8:14, 8:16, 15:15, 15:22, 16:2, 16:3, 16:9, 16:12

**discuss** [1] - 23:20

**discussion** [1] - 16:25

**disputes** [1] - 22:11

**district** [1] - 12:17

**DPA** [3] - 13:14, 13:25, 15:6

**dramatically** [1] - 15:8

**during** [4] - 3:2, 7:10, 21:17, 22:11

## E

**effort** [1] - 19:4

**either** [3] - 3:22, 11:1, 20:20

**email** [1] - 14:24

**employed** [1] - 14:11

**employees** [15] - 4:20, 9:20, 9:23, 9:24, 10:4, 10:5, 14:6, 14:10, 14:21, 14:23, 15:10, 17:16, 17:22, 18:7

**employing** [1] - 4:13

**end** [2] - 22:22, 23:12

**endeavor** [1] - 9:5

**engaged** [4] - 4:22, 17:2, 17:8, 20:8

**engaging** [1] - 20:15

**enhanced** [2] - 13:13, 16:18

**enhancements** [2] -

16:20, 19:2

**enriched** [3] - 10:12, 10:15, 11:6

**ensure** [1] - 16:21

**enter** [1] - 20:6

**entered** [1] - 14:3

**events** [1] - 4:16

**evidence** [4] - 5:25, 7:1, 16:14, 17:25

**exact** [1] - 9:25

**example** [4] - 4:3, 4:16, 5:17, 11:13

**except** [2] - 8:12, 8:14

**excess** [1] - 9:24

**exclude** [1] - 22:1

**excluded** [2] - 21:13, 23:13

**executives** [3] - 3:21, 6:3

**existence** [1] - 9:19

**expect** [1] - 20:5

**expected** [1] - 22:14

**extensive** [1] - 18:20

**extremely** [1] - 18:23

## F

**face** [1] - 13:16

**facility** [1] - 14:14

**family** [2] - 6:9, 18:14

**far** [3] - 5:1, 7:14, 14:16

**fate** [1] - 18:15

**few** [1] - 3:14

**figure** [1] - 17:7

**file** [1] - 20:24

**filed** [4] - 3:17, 3:19, 18:3, 22:12

**Financial** [1] - 7:22

**fine** [3] - 8:23, 9:4, 19:23

**finish** [1] - 7:8

**firm** [3] - 3:6, 9:6, 9:7

**first** [2] - 3:16, 17:8

**five** [1] - 12:9

**follow** [1] - 22:5

**forced** [1] - 17:22

**foreign** [1] - 12:2

**forensic** [1] - 9:5

**formal** [1] - 23:16

**forward** [6] - 13:1, 14:22, 19:2, 20:1, 20:16, 23:1

**four** [3] - 4:19, 15:16, 16:9

**France** [1] - 6:18

**fraud** [1] - 12:21

**French** [2] - 16:4, 17:20

**full** [3] - 9:4, 9:16, 22:25

**fully** [4] - 4:11, 12:21, 13:6, 18:19

**Fulton** [2] - 14:16, 14:18

**future** [1] - 19:6

## G

**general** [2] - 20:4, 20:5

**German** [2] - 16:7, 17:20

**Germany** [2] - 6:17, 15:24

**goal** [1] - 17:2

**Government** [8] - 3:2, 3:12, 8:24, 14:22, 14:23, 15:5, 19:20, 20:10

**government** [6] - 10:22, 10:24, 11:5, 12:23, 13:2

**Government's** [1] - 23:9

**greatly** [1] - 18:14

**guideline** [1] - 9:4

**guidelines** [1] - 9:14

**guilty** [2] - 13:16, 17:13

## H

**handled** [1] - 22:16

**headquarters** [2] - 14:13, 14:15

**hearing** [4] - 21:12, 21:25, 22:3

**higher** [1] - 4:1

**highest** [1] - 6:3

**hired** [1] - 9:5

**holding** [2] - 4:9, 17:11

**holdover** [1] - 8:6

**Honor** [17] - 3:1, 3:18, 3:24, 5:11, 5:15, 7:25, 8:13, 9:2, 12:14, 16:14, 20:23, 21:9, 23:2, 23:8, 23:21, 23:24, 23:25

**hopeful** [1] - 19:10

**hour** [1] - 21:20

**hundred** [2] - 10:2, 10:20

**hypothetical** [1] - 15:6

## I

**idea** [1] - 3:20

**identified** [4] - 7:1, 7:3, 8:24, 11:24

**important** [1] - 18:23

**impression** [2] - 12:24, 15:25

**inability** [1] - 9:16

**incent** [3] - 18:22, 19:2, 19:6

**incentivize** [1] - 19:8

**incident** [2] - 6:11, 7:11

**included** [2] - 6:14, 6:20

**increased** [1] - 15:7

**independent** [8] - 6:8, 8:16, 8:21, 8:24, 9:7, 9:8, 15:14, 15:23

**indicated** [1] - 12:15

**individual** [1] - 20:12

**individuals** [22] - 4:7, 4:10, 4:12, 4:13, 4:21, 4:22, 4:24, 5:1, 5:2, 5:5, 6:2, 7:1, 8:15, 12:3, 12:7, 13:12, 17:11, 19:12, 19:13, 19:14, 20:14

**informal** [1] - 20:18

**Information** [8] - 3:17, 3:18, 4:7, 4:14, 11:24, 18:4, 20:21, 20:24

**information** [2] - 11:4, 21:6

**innocent** [2] - 4:13, 17:16

**inside** [2] - 6:9, 7:12

**institution** [1] - 18:5

**interest** [7] - 12:4, 12:6, 12:8, 17:15, 17:16, 21:14, 22:4

**interests** [1] - 17:20

**interviewed** [1] - 14:22

**interviewing** [1] - 14:23

**investigation** [4] - 3:21, 5:10, 13:7, 13:11

**involved** [19] - 4:8, 4:22, 4:25, 5:7, 5:8, 5:17, 6:23, 7:2, 10:10, 10:12, 11:10, 11:23, 13:12, 14:24, 14:25, 16:15, 17:12, 17:25

**issue** [6] - 7:9, 15:1, 18:2, 18:3, 22:19, 23:17

**issues** [2] - 13:19, 13:20

**itself** [3] - 7:15, 12:8, 21:11

## J

**January** [1] - 3:19
**jeopardize** [1] - 9:12
**jeopardizing** [2] - 9:19, 17:18
**jeopardy** [1] - 13:24
**jobs** [3] - 14:25, 15:10, 15:17
**jointly** [1] - 22:2
**Justice** [1] - 16:23
**justice** [4] - 17:3, 17:11, 21:14, 22:4

## L

**lack** [1] - 11:12
**large** [3] - 6:7, 9:22, 10:6
**late** [1] - 21:21
**leadership** [2] - 5:20, 11:10
**least** [1] - 5:23
**length** [2] - 22:17, 22:18
**less** [1] - 13:22
**level** [1] - 6:3
**liable** [1] - 18:5
**licenses** [2] - 15:2, 15:3
**licensing** [1] - 13:20
**likely** [1] - 15:10
**limitations** [1] - 22:20
**line** [4] - 7:9, 10:7, 10:9, 15:18
**liquidate** [1] - 15:17
**located** [3] - 6:16, 6:17, 6:18
**look** [2] - 23:14, 23:17
**looked** [1] - 21:21
**looking** [1] - 20:6
**looks** [1] - 22:18
**lost** [2] - 15:11, 15:17

## M

**Magnan** [1] - 3:8
**MAGNAN** [1] - 3:10
**magnitude** [1] - 9:21
**majority** [1] - 14:9
**management** [5] - 4:3, 4:4, 4:5, 7:13, 8:12
**manufactured** [1] - 10:15
**Maryland** [2] - 14:16, 14:18

**matter** [7] - 5:3, 7:5, 13:15, 16:23, 21:3, 21:12, 22:24
**mean** [9] - 5:4, 5:5, 5:19, 15:12, 15:14, 17:2, 18:3, 21:19, 22:19
**meet** [2] - 19:21, 19:25
**meeting** [1] - 11:20
**members** [3] - 4:17, 4:18, 18:14
**mentioned** [2] - 11:4, 12:2
**microphone** [1] - 4:1
**might** [1] - 12:19
**Mikerin** [1] - 17:14
**mind** [1] - 5:19
**misconduct** [3] - 7:2, 8:4, 20:8
**missing** [1] - 13:2
**most** [2] - 15:10, 17:22
**motion** [2] - 22:5, 23:16
**motions** [1] - 22:11
**move** [2] - 19:25, 23:1
**moving** [1] - 22:3
**MR** [70] - 3:1, 3:6, 3:10, 3:18, 3:24, 4:6, 4:20, 5:1, 5:10, 5:15, 6:2, 6:12, 6:17, 6:20, 7:14, 7:19, 7:22, 7:25, 8:3, 8:8, 8:10, 8:13, 8:16, 8:19, 9:2, 9:24, 10:4, 10:9, 10:20, 10:23, 11:1, 11:3, 11:17, 11:22, 12:7, 12:14, 13:4, 13:10, 13:19, 14:2, 14:9, 14:11, 14:15, 14:18, 14:20, 15:21, 16:4, 16:7, 16:11, 16:14, 16:18, 17:5, 17:10, 17:24, 18:6, 18:17, 19:4, 19:10, 19:18, 20:5, 20:23, 21:9, 21:17, 21:24, 23:2, 23:4, 23:8, 23:21, 23:24, 23:25

## N

**nature** [2] - 21:4, 23:14
**necessary** [1] - 16:20
**need** [3] - 21:7, 22:21, 23:20
**needs** [5] - 19:19, 19:21, 19:22, 20:22
**negligible** [1] - 12:5

**new** [3] - 4:5, 8:12, 8:14
**nobody** [1] - 13:1
**none** [2] - 5:7, 12:25
**note** [2] - 12:12, 14:2
**nothing** [2] - 18:11, 22:23
**NRC** [1] - 15:4
**nuclear** [3] - 10:12, 10:13, 10:15
**number** [6] - 9:23, 9:24, 9:25, 11:20, 14:8, 19:24

## O

**obligations** [2] - 19:18, 19:24
**obtained** [1] - 11:14
**obviously** [2] - 15:7, 22:12
**occur** [1] - 9:15
**occurred** [2] - 8:4, 8:22
**office** [1] - 14:13
**Officer** [1] - 7:22
**officer** [2] - 7:23, 8:6
**officers** [7] - 4:19, 4:21, 5:13, 7:17, 7:18, 7:19, 7:20
**once** [3] - 18:18, 21:24, 23:17
**one** [10] - 5:5, 5:17, 5:19, 13:1, 15:22, 15:23, 16:1, 19:9
**ones** [1] - 17:21
**operate** [1] - 15:3
**operation** [1] - 14:20
**opposed** [1] - 17:3
**orally** [1] - 22:3
**order** [5] - 9:21, 13:23, 16:20, 22:6, 22:16
**organization** [1] - 7:15
**outlined** [2] - 9:11, 19:21
**outside** [2] - 7:12, 7:15
**overall** [1] - 3:21
**overlapping** [2] - 4:20, 5:13
**overseas** [3] - 6:13, 6:15, 14:8
**own** [3] - 12:4, 17:19, 19:9
**owned** [2] - 6:13, 12:2
**ownership** [2] - 12:4, 12:8

## P

**paid** [1] - 11:7
**papers** [1] - 22:5
**parent** [7] - 6:13, 6:15, 6:18, 6:22, 7:1, 8:17, 8:19
**part** [5] - 3:20, 4:4, 7:13, 16:13, 18:11
**parties** [2] - 21:18, 22:2
**pay** [7] - 8:23, 9:4, 9:10, 9:16, 9:18, 19:22, 20:9
**paying** [1] - 9:11
**payments** [1] - 11:14
**penalties** [1] - 20:9
**penalty** [2] - 9:17, 19:5
**pendency** [1] - 21:17
**people** [10] - 4:25, 5:7, 5:22, 5:23, 6:5, 15:15, 15:19, 17:19, 17:25, 18:11
**percent** [6] - 10:20, 11:15, 11:16, 11:19, 11:23, 12:9
**percentage** [5] - 11:11, 11:18, 11:19, 11:21, 12:4
**perhaps** [5] - 5:23, 12:21, 17:8
**period** [2] - 8:7, 10:11
**permission** [1] - 3:1
**permits** [2] - 15:2, 15:3
**perpetrators** [1] - 12:3
**person** [1] - 16:1
**personnel** [1] - 17:1
**perspective** [1] - 21:7
**philosophical** [1] - 16:22
**place** [3] - 5:22, 16:17, 17:9
**planning** [1] - 23:15
**plant** [2] - 14:14, 14:15
**plants** [1] - 10:13
**plea** [5] - 13:16, 15:7, 15:8, 17:13, 17:14
**pleas** [1] - 19:13
**pled** [1] - 15:23
**plus** [1] - 22:18
**point** [6] - 5:11, 6:23, 14:10, 14:21, 22:14, 23:18
**police** [1] - 19:8
**position** [3] - 5:20, 7:24, 20:20
**potential** [2] - 5:24,

18:9
**power** [1] - 10:13
**pre** [1] - 7:10
**pre-dating** [1] - 7:10
**precise** [2] - 11:19, 11:20
**prepared** [1] - 20:24
**present** [2] - 3:8, 4:11
**presentation** [1] - 15:6
**president** [1] - 17:14
**presidents** [4] - 6:4, 6:21, 6:23, 7:11
**previous** [1] - 12:18
**primarily** [1] - 10:18
**primary** [1] - 22:2
**private** [1] - 10:22
**probable** [2] - 18:4, 18:8
**problem** [1] - 13:2
**proceeding** [1] - 22:7
**proceedings** [1] - 20:20
**process** [1] - 21:3
**products** [1] - 10:19
**profits** [1] - 9:23
**program** [3] - 11:5, 11:7, 13:13
**projects** [1] - 11:13
**propose** [1] - 22:15
**proposed** [2] - 3:12, 22:6
**prosecuted** [1] - 3:22
**prosecuting** [1] - 18:10
**prosecution** [12] - 7:5, 7:7, 12:16, 12:20, 13:17, 13:22, 14:4, 16:24, 19:16, 20:7, 21:25, 22:8
**Prosecution** [6] - 3:13, 19:11, 20:21, 20:25, 21:18, 23:12
**prosecutions** [3] - 13:8, 18:21, 20:12
**protected** [1] - 17:20
**protecting** [2] - 17:15, 17:16
**provide** [1] - 19:17
**provided** [2] - 3:12, 21:6
**providing** [1] - 21:6
**provisionally** [1] - 23:11
**pull** [1] - 4:1
**pursuant** [2] - 7:7, 11:7
**put** [2] - 13:23, 18:25

## Q

**questions** [2] - 3:14, 7:9

## R

**raised** [1] - 13:20
**really** [2] - 17:15, 18:2
**reason** [3] - 13:14, 23:18, 23:19
**reasons** [1] - 12:19
**referenced** [1] - 14:24
**regarding** [2] - 8:22, 22:20
**regulation** [1] - 15:1
**regulators** [3] - 13:19, 15:2, 15:5
**related** [3] - 11:4, 12:25, 22:7
**relevant** [1] - 10:11
**rely** [1] - 17:17
**remedial** [1] - 16:19
**remediate** [1] - 19:7
**remediated** [3] - 4:11, 13:11, 18:20
**remediation** [1] - 19:1
**removed** [2] - 13:12, 16:12
**render** [1] - 17:3
**report** [5] - 12:13, 13:5, 14:5, 19:20, 20:10
**reported** [2] - 12:22
**representation** [2] - 5:9, 9:3
**representative** [1] - 3:8
**representatives** [1] - 6:21
**request** [2] - 21:1, 23:9
**requested** [1] - 22:13
**requesting** [1] - 22:6
**required** [1] - 20:11
**requirement** [3] - 21:10, 21:13, 22:8
**resolution** [2] - 7:3, 7:5
**respect** [1] - 12:1
**responsible** [1] - 4:9
**review** [1] - 21:10
**role** [3] - 12:17, 21:24, 22:7
**roles** [1] - 12:18
**rule** [1] - 22:13
**ruling** [1] - 23:16
**running** [1] - 15:16
**runs** [1] - 4:17

**Russia** [2] - 10:13, 11:6

## S

**salary** [1] - 17:18
**Salem** [1] - 12:15
**SALEM** [1] - 3:1
**sales** [1] - 9:23
**save** [4] - 15:10, 17:1, 17:3, 17:7
**seal** [1] - 20:19
**sealed** [1] - 20:22
**sealing** [1] - 21:1
**see** [3] - 8:18, 23:18, 23:19
**seek** [1] - 19:5
**seeking** [2] - 7:6, 17:11
**seem** [1] - 18:15
**self** [4] - 12:13, 12:22, 13:5, 14:5
**self-report** [3] - 12:13, 13:5, 14:5
**self-reported** [1] - 12:22
**sell** [1] - 15:18
**senior** [1] - 11:9
**sense** [2] - 4:15, 6:7
**sentencing** [1] - 9:14
**shipping** [4] - 10:12, 10:14, 10:16
**shops** [1] - 19:9
**sides** [1] - 21:5
**significant** [2] - 17:4, 20:3
**simply** [1] - 19:4
**situation** [1] - 13:25
**small** [2] - 6:12, 14:20
**smaller** [1] - 11:20
**sold** [1] - 15:13
**someone** [3] - 8:24, 15:13, 15:18
**sometimes** [1] - 6:9
**sort** [2] - 4:5, 15:5
**sounds** [1] - 23:15
**speedy** [2] - 21:14, 23:13
**Speedy** [2] - 22:2, 22:15
**spends** [1] - 17:6
**stakes** [1] - 15:7
**standards** [1] - 19:21
**standpoint** [1] - 16:23
**starting** [1] - 21:18
**state** [1] - 9:15
**States** [6] - 10:13, 11:7, 14:7, 14:12, 15:22, 16:5

**status** [1] - 8:2
**statute** [1] - 22:20
**steps** [2] - 20:11, 21:7
**still** [6] - 7:18, 7:20, 7:23, 8:17, 16:6, 22:25
**stock** [1] - 12:5
**Strawn** [1] - 3:7
**structure** [1] - 4:4
**stuff** [1] - 20:22
**subcontracts** [1] - 10:25
**submission** [1] - 12:12
**submit** [1] - 23:15
**submitted** [3] - 21:19, 21:22, 23:15
**substantial** [2] - 11:18, 13:23
**substantially** [3] - 9:12, 9:18, 10:6
**suffer** [1] - 18:14
**sufficient** [3] - 16:16, 19:13, 20:13
**suggested** [1] - 3:11
**supported** [1] - 11:13
**supposedly** [1] - 8:22
**switch** [1] - 15:20

## T

**tainted** [1] - 11:12
**TENEX** [1] - 11:24
**terms** [7] - 5:16, 7:7, 15:1, 16:5, 21:10, 22:9, 22:10
**test** [1] - 9:5
**THE** [65] - 3:4, 3:9, 3:11, 3:20, 3:25, 4:15, 4:24, 5:4, 5:12, 5:16, 6:6, 6:15, 6:19, 7:8, 7:16, 7:21, 7:24, 8:1, 8:5, 8:11, 8:14, 8:18, 8:20, 9:20, 10:2, 10:5, 10:18, 10:21, 10:25, 11:2, 11:9, 11:25, 12:10, 12:15, 13:9, 13:18, 14:1, 14:6, 14:13, 14:17, 14:19, 15:12, 15:25, 16:6, 16:9, 16:12, 16:16, 16:22, 17:6, 17:19, 18:2, 18:8, 19:3, 19:8, 19:16, 20:4, 20:17, 21:2, 21:16, 21:19, 22:15, 23:3, 23:5, 23:10, 23:22
**themselves** [1] - 9:14
**Thomas** [1] - 3:6

**three** [1] - 16:3
**timing** [1] - 22:19
**TLI** [9] - 3:7, 3:8, 7:4, 7:15, 12:2, 12:8, 13:1, 14:15, 15:5
**today** [7] - 3:3, 3:11, 7:6, 7:20, 7:23, 21:18, 23:20
**together** [1] - 3:11
**toll** [1] - 22:21
**totally** [1] - 15:14
**transport** [1] - 11:6
**Transportation** [1] - 15:4
**transportation** [2] - 10:10, 10:17
**transporting** [1] - 10:11
**trial** [2] - 21:14, 23:13
**Trial** [2] - 22:2, 22:16
**trucking** [1] - 10:12
**try** [2] - 15:9, 19:4
**trying** [2] - 17:7, 18:25
**two** [4] - 4:24, 6:23, 8:14, 12:2, 12:3, 15:22
**type** [1] - 9:15

## U

**U.S** [1] - 14:10
**ultimate** [1] - 6:18
**unable** [2] - 9:3, 9:10
**uncovered** [3] - 5:21, 5:24, 12:21
**under** [4] - 4:5, 9:14, 21:14, 22:1
**unique** [1] - 14:5
**United** [6] - 10:13, 11:6, 14:7, 14:11, 15:22, 16:5
**unsealed** [1] - 20:24
**untainted** [1] - 15:19
**up** [4] - 4:1, 7:8, 22:5, 22:21
**uranium** [5] - 10:12, 10:15, 10:18, 10:20, 11:6

## V

**variety** [1] - 10:19
**vast** [1] - 14:9
**verification** [1] - 9:6
**versus** [3] - 4:2, 10:22, 15:7
**viewing** [1] - 19:14

## W

**wants** [1] - 18:22
**wide** [1] - 10:19
**Winston** [1] - 3:6
**word** [1] - 11:12
**worry** [1] - 18:15
**written** [2] - 22:5, 23:16

## Y

**years** [2] - 4:19, 15:16

## Z

**zero** [1] - 11:22